# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

WILLIAM MCKENZIE, and his wife,
EMILY MCKENZIE

VERSUS

ABBOTT LABORATORIES, and,
ABC INSURANCE COMPANY

CIVIL ACTION

20-178-SDD-SDJ

## RULING

This matter is before the Court on the *Motion to Dismiss*[1] filed by Defendant, Abbott Laboratories ("Defendant"). Plaintiffs William McKenzie ("McKenzie") and Emily McKenzie (collectively "Plaintiffs") filed an *Opposition*,[2] to which Defendant filed a *Reply*.[3] For the following reasons, Defendant's *Motion* shall be granted in part and denied in part.

But that is not all. On the same day that Defendant filed its *Motion to Dismiss*, it also filed a *Request for Judicial Notice* asking the Court to take judicial notice of over 750 pages of Food and Drug Administration ("FDA") documents.[4] Plaintiffs filed an *Opposition* to that *Motion* and attached eight exhibits of their own.[5] Plaintiffs also filed a *Notice of Alternative Request for Judicial Notice* asking the Court to take judicial notice of those eight exhibits.[6] Defendant then filed an *Opposition* to that *Motion*. These *Motions* will both be denied.

---

[1] Rec. Doc. No. 43.
[2] Rec. Doc. No. 54.
[3] Rec. Doc. No. 63.
[4] *See* Rec. Doc. No. 44 and exhibits attached thereto.
[5] *See* Rec. Doc. No. 55 and exhibits attached thereto.
[6] *See* Rec. Doc. No. 56 and exhibits attached thereto.

68447

On the same day that Plaintiffs filed their *Notice of Alternative Request for Judicial Notice*, they also filed an *Alternative Motion to Continue Consideration of Defendant's Rule 12(b)(6) Motion Pending Limited Preemption Discovery by the Plaintiffs*.[7] Defendant filed an *Opposition* to that *Motion*.[8] That *Motion* will be denied as moot. Finally, Defendant has filed three *Notices of Supplemental Authority*,[9] and Plaintiffs filed a *Response*.[10]

## I. BACKGROUND

This is a products liability case. The following facts are derived from the *First Amended Complaint*.[11] In 2012, McKenzie had a severe viral infection in his heart and was placed on the heart transplant list.[12] On September 5, 2017, while waiting for a transplant, he was implanted with a Heartmate 3, a "left ventricular assist device to assist his blood flow and improve his health."[13] Defendant manufactured the Heartmate 3.[14]

On April 5, 2018, Defendant "'recalled'" the Heartmate 3 due to a "'…malfunction in the device's outflow graft assembly that may cause the outflow graft to twist and close up (occlusion) over time' possibly…leading to serious adverse events such as blood clots and death.'"[15] One month later, Defendant sent a letter to its Heartmate 3 customers advising them of the recall but also advising them that Defendant did not recommend that physicians remove the device.[16]

---

[7] Rec. Doc. No. 57.
[8] Rec. Doc. No. 65.
[9] Rec. Doc. Nos. 66, 68, and 69.
[10] Rec. Doc. No. 67.
[11] Rec. Doc. No. 40.
[12] *Id*. at 2.
[13] *Id*.
[14] *Id*.
[15] *Id*. (alteration in original).
[16] *Id*.

On April 2, 2019, McKenzie's Heartmate 3 malfunctioned and the outflow graft twisted.[17] McKenzie underwent surgery on April 8 and a new Heartmate pump was put in.[18] He survived but developed a serious infection and other complications.[19] He was removed from the heart transplant list.[20]

Plaintiffs allege that Defendant knew about the outflow graft malfunction in Spring of 2018 because of adverse event reports.[21] Plaintiffs also allege that Defendant failed to submit all of those reports to the FDA as required.[22] According to Plaintiffs, the FDA had to notify Defendant of the need for corrective action twice before Defendant took any.[23] Defendant eventually recalled the Heartmate 3, and the FDA classified the recall as a Class 1 recall, which is allegedly the most serious type of recall.[24]

Plaintiffs allege that, had Defendant timely reported adverse events regarding the Heartmate 3 to the FDA, the FDA would have disseminated the information to doctors, and McKenzie's doctor, Dr. Ventura, could have made adjustments to the Heartmate 3 during implantation or used a different product altogether.[25] Plaintiffs also allege that Defendant failed to monitor the production process which caused McKenzie's Heartmate 3 to deviate from its specifications such that the screw ring on McKenzie's Heartmate 3 did not properly tighten, which then caused the outflow graft assembly to twist.[26] Plaintiffs

---

[17] *Id*.
[18] *Id*. at 2–3.
[19] *Id*. at 3.
[20] *Id*.
[21] *Id*. at 4.
[22] *Id*.
[23] *Id*. at 5.
[24] *Id*. at 5–6.
[25] *Id*. at 5–6.
[26] *Id*. at 6–7.

aver that Defendant breached an express warranty it made to doctors, including Dr. Ventura.[27]

Plaintiffs sued under the Louisiana Products Liability Act ("LPLA")[28] asserting several theories: (1) failure to train, (2) mismanufacture, (3) failure to warn, and (4) breach of express warranty.

## II.    LAW AND ANALYSIS

### A.  Rule 12(b)(6) Motion to Dismiss

When deciding a Rule 12(b)(6) motion to dismiss, "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"[29] The Court may consider "the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."[30] "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"[31]

In *Twombly*, the United States Supreme Court set forth the basic criteria necessary for a complaint to survive a Rule 12(b)(6) motion to dismiss. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."[32] A complaint is also insufficient if it merely "tenders 'naked assertion[s]' devoid

---

[27] *Id*. at 27.
[28] La. R.S. 9:2800.51 *et seq*.
[29] *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit,* 369 F.3d 464, 467 (5th Cir. 2004)).
[30] *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011).
[31] *In re Katrina Canal Breaches Litigation*, 495 F.3d at 205 (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007)).
[32] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (hereinafter *Twombly*).

of 'further factual enhancement.'"[33] However, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[34] In order to satisfy the plausibility standard, the plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully."[35] "Furthermore, while the court must accept well-pleaded facts as true, it will not 'strain to find inferences favorable to the plaintiff.'"[36] On a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation."[37]

### B. Medical Device Express Preemption

In 1976, Congress amended the Food, Drug, and Cosmetic Act ("FDCA") to classify medical devices into three categories based on the potential risk to the public.[38] Relevant here are Class III devices, which are those that present "a potential unreasonable risk of illness of injury" or which are "purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health."[39] The manufacturer of a Class III device must give the FDA "reasonable assurance" that the device is both safe and effective before the manufacturer can put the device on the market.[40] The manufacturer provides that "reasonable assurance" through the premarket approval ("PMA") process, and the FDA's involvement with the device continues even after the PMA process is complete.[41]

---

[33] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted) (hereinafter "*Iqbal*").
[34] *Id*.
[35] *Id*.
[36] *Taha v. William Marsh Rice Univ.*, 2012 WL 1576099 at *2 (S.D. Tex. 2012) (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)).
[37] *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).
[38] *Gomez v. St. Jude Med. Daig Div. Inc.*, 442 F.3d 919, 928 (5th Cir. 2006).
[39] *Id*. (cleaned up).
[40] *Id*. (internal citations omitted).
[41] *Id*.

68447

Congress also expressly preempted state law causes of action that establish "requirements" which are "different from, or in addition to" federal requirements.

21 U.S.C. § 360k provides:

> [N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement— (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

The Supreme Court in *Riegel v. Medtronic*[42] held that state tort law imposes requirements that are "different from, or in addition to" if: (1) "the Federal Government has established requirements applicable to" the challenged medical device and (2) the state law requirements are "different from, or in addition to" those requirements and "relate to safety and effectiveness."[43] States, however, are free to impose duties that "parallel, rather than add to, federal requirements" such as by "providing a damages remedy for claims premised on a violation of FDA regulations."[44] The Fifth Circuit has instructed that district courts must "look through the general duties imposed by the state-law causes of action and consider the effect a successful lawsuit asserting those causes of action would have and determine whether they threaten the federal PMA process requirements."[45]

Plaintiffs do not dispute that the first prong is met in this case. As stated in *Riegel*, the PMA process imposes "requirements" because the FDA "requires a device that has received premarket approval to be made with almost no deviations from the specifications in its approval application…."[46] While Plaintiffs do not allege that the Heartmate 3 went

---

[42] 552 U.S. 312, 321–24 (2008).
[43] *Id*.
[44] *Id*. at 330.
[45] *Gomez*, 442 F.3d at 929–30.
[46] *Riegel*, 552 U.S. at 323.

68447

through the PMA process, they admit it in their *Opposition*[47] to Defendant's *Request for Judicial Notice*. Moreover, Defendant asserts that the Heartmate 3 went through the PMA process in its *Motion to Dismiss*, and Plaintiffs do not attempt to rebut that assertion in their *Opposition*. The Court concludes that the FDA has established "requirements" as to the Heartmate 3 as required by *Riegel*.

Therefore, the Court must determine whether Plaintiffs seek to impose "requirements" on the Heartmate 3 that are "different from, or in addition to" the requirements that the FDA imposed during the PMA process. While the parties' briefing on this issue is copious, the issue turns on two, relatively simple questions: (1) have Plaintiffs adequately pled a claim under state law? and (2) if so, did Defendant's actions that Plaintiffs complain of violate FDA regulations or the FDA's specifications for the Heartmate 3? If the answer to the first question is "no," then Plaintiffs have failed to state a claim under Fed. R. Civ. P. 12(b)(6) for a violation of the relevant state law. If the answer to the second question is "no," then Plaintiffs are trying to impose requirements on Defendant that are "different from, or in addition to" federal requirements, and the claim is expressly preempted.

However, the Court's task is complicated by the confidential nature of the Heartmate 3's PMA file.[48] Defendant has not shared the PMA file with Plaintiffs, but has asked the Court to take judicial notice of sixteen documents from the file.[49] The Court declines for two reasons.

---

[47] Rec. Doc. No. 55, p. 4.
[48] *Bass v. Stryker Corp.*, 669 F.3d 501, 511 (5th Cir. 2012).
[49] Rec. Doc. No. 44.

68447

First, as Plaintiffs argue, Defendant has presumably chosen the sixteen documents from the PMA file that best support its position. These documents are offered without their contextual brethren, and Plaintiffs do not have access to the rest of the file, so Plaintiffs cannot contextualize the documents Defendant has offered. Second, and more fundamentally, this is not the appropriate procedural posture for the Court to analyze hundreds of pages of documents. The Court's task on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is to analyze the sufficiency of the complaint—not to consider evidence. In this posture, where the gates of discovery have yet to open, Plaintiffs cannot be forced to rebut Defendant's evidentiary assertions. Therefore, Defendant's *Request for Judicial Notice*[50] is denied. Plaintiffs' *Alternative Request for Judicial Notice*[51] is likewise denied as moot.

The confidential nature of the PMA file puts Plaintiffs in an unenviable position. They must allege a violation of one of the FDA-imposed requirements documented in the file, but they cannot see the file. Cognizant of this quandary, the Fifth Circuit held in *Bass v. Stryker Corp.* that a plaintiff seeking to hold the manufacturer of a Class III medical device liable for injuries allegedly caused by the device may plead that the manufacturer failed to comply with the specific processes and procedures approved by the FDA and detailed in the PMA file or that the manufacturer failed to comply with the FDA's Current Good Manufacturing Practices ("CGMPs").[52] In either case, the plaintiff must allege causation by connecting the manufacturer's breach of either set of standards to the plaintiff's injury.[53]

---

[50] Rec. Doc. No. 44.
[51] Rec. Doc. No. 56.
[52] *Bass*, 669 F.3d at 512.
[53] *Id*.

1. <u>Failure to Train</u>

Plaintiffs assert a failure to train theory. Plaintiffs aver that Defendant should have trained Dr. Ventura to avoid twisting of the outflow graft either by tightening the screw ring on the Heartmate 3 or another method.[54] The Court need not consider whether this claim is expressly preempted because the Court finds that a failure to train claim is not cognizable under the LPLA.

The LPLA provides that a:

> manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.[55]

"Unreasonably dangerous" is defined narrowly to include only when the product is unreasonably dangerous "in construction or composition," "in design," because of an inadequate warning, or because it does not conform to an express warranty of the manufacturer.[56] Under the LPLA, the product is on trial.

Plaintiffs cite no authority, and the Court has found none, that stands for the proposition that Plaintiffs can assert a failure to train claim under the LPLA. Indeed, such a claim would shift the focus from the product to the Defendant's actions. Plaintiffs cite two cases in support of their cursory argument that a failure to train physicians claim is not expressly preempted.[57] In one of the cases, *In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Prod. Liab. Litig.*,[58] the district court held that a failure to

---

[54] Rec. Doc. No. 40, p. 5.
[55] La. Stat. Ann. § 9:2800.54(A).
[56] *Id*. at (B).
[57] Rec. Doc. No. 54, p. 20.
[58] 300 F. Supp. 3d 732, 744 (D. Md. 2018).

68447

train claim rooted in a negligence action was not expressly preempted. The other case that Plaintiffs cite appears to be an inaccurate citation. While Plaintiffs may be correct that failure to train claims are not expressly preempted when properly couched as a negligence action, the Court need not decide that issue at this juncture since Plaintiffs' failure to train claim is not cognizable under the LPLA, which is the only law Plaintiffs plead a violation of.

    2. <u>Mismanufacture</u>

Plaintiffs assert a mismanufacture claim under the LPLA. La. R.S. § 9:2800.55 provides:

> A product is unreasonably dangerous in construction or composition if, at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer.

Defendant argues that Plaintiffs' mismanufacture claim is merely a design defect claim in disguise. Design defect claims are precisely the type of claim Congress intended to expressly preempt because a design defect claim would permit a jury to second-guess the FDA-approved Heartmate 3 design.[59] Plaintiffs counter that they have adequately alleged that the Heartmate 3 failed to comply with that FDA-approved design, which would be a valid mismanufacture claim.

Plaintiffs' mismanufacture claim toes the line between a mismanufacture claim and a design defect claim. While some of Plaintiffs' allegations appear to directly attack the design of the Heartmate 3,[60] others include allegations of "failure to inspect, adopt quality

---

[59] *Gomez v. St. Jude Med. Daig Div. Inc.*, 442 F.3d 919, 930 (5th Cir. 2006).
[60] *See e.g.* Rec. Doc. No. 40, p. 6 "Among the manufacturing defects were the failure to provide a screw ring that could be tightened effectively without strain and the failure to develop, use, include with and train re: use of a surgical clip to fix the pump outflow graft to the connector…."

68447

control measures regarding [the Heartmate 3], [and] use of materials that permitted over-rotation and twisting and a failure to monitor the process from beginning to end."[61] Further:

> Defendant failed to develop, conduct, control[,] and monitor production processes to ensure good workmanship and to ensure the product conformed to specifications. This includes, but is by no means limited to, failure to adopt standard operating procedures, monitoring, compliance with standards and codes, good workmanship[,] and testing. Inspection and testing would have revealed this very basic problem of the lack of a tight fit in the screw ring and would have prevented the looseness that allowed the rotation of the outflow graft assembly…. These defects in manufacturing procedures allowed this very basic defect of outflow graft twisting and occlusion which proximately caused the loss of blood flow and corresponding injuries that [] McKenzie suffered.[62]

Plaintiffs also allege violations of the applicable CGMPs.[63] Plaintiffs thus draw a causal link between Defendant's alleged failure to control and monitor the production process, in violation of the relevant CGMPs, and the lack of a tight fit in the screw ring which allegedly caused the twisting of the outflow graft assembly which led to McKenzie's injury. The allegations, read in the light most favorable to Plaintiffs, are not limited to the assertion that the design of the screw ring and outflow graft assembly was defective, which would be an expressly preempted design defect claim. Rather, Plaintiffs sufficiently allege that the particular screw ring in McKenzie's Heartmate 3 was defective and, critically, was defective because Defendant failed to monitor and control its production processes to ensure good workmanship in violation of the applicable CGMPs. Plaintiffs also allege "reasonably anticipated use" of the Heartmate 3. The Court finds that Plaintiffs have plausibly stated a mismanufacture claim that is not preempted.

---

[61] *Id*. at 6–7.
[62] *Id*. at 7.
[63] *Id*.

      3. <u>Failure to Warn</u>

Plaintiffs assert a failure to warn claim under the LPLA. La. R.S. § 9:2800.57 provides:

> A product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.[64]

Further:

> A manufacturer of a product who, after the product has left his control, acquires knowledge of a characteristic of the product that may cause damage and the danger of such characteristic, or who would have acquired such knowledge had he acted as a reasonably prudent manufacturer, is liable for damage caused by his subsequent failure to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.[65]

Plaintiffs allege that Defendant did not have the procedures in place to process adverse event reports regarding the Heartmate 3 and that Defendant willfully failed to report adverse events to the FDA in violation of the applicable CGMPs.[66] Plaintiffs also allege that Defendant undercounted the number of adverse events and failed to timely respond to the FDA's letters to Defendant demanding immediate action.[67] Plaintiffs argue that Defendant's alleged failures to report adverse events to the FDA violated the LPLA's failure to warn provision. Defendant argues that: (1) this claim is not cognizable under the LPLA; (2) even if cognizable, it is expressly preempted; and (3) even if it is not expressly preempted, Plaintiffs fail to state a claim under Fed. R. Civ. P. 12(b)(6).

---

[64] La. R.S. § 9:2800.57(A).
[65] La. R.S. § 9:2800.57(C).
[66] Rec. Doc. No. 40, p. 4.
[67] *Id*. at 5.

68447

The Court finds that it need not decide whether Plaintiffs' failure to report adverse events theory is cognizable under the LPLA because even if it is,[68] and even if it is not expressly preempted, Plaintiffs have not adequately pled it under Fed. R. Civ. P. 12(b)(6). To sufficiently state a failure to warn claim under the LPLA when the learned intermediary doctrine applies, a plaintiff must show: (1) "that the defendant failed to warn (or inadequately warned) the physician of a risk associated with the product that was not otherwise known to the physician," and (2) "that this failure to warn the physician was both a cause in fact and the proximate cause of the plaintiff's injury."[69] After adapting this standard to Plaintiffs' failure to report adverse events theory, Plaintiffs must show that Defendant failed to report the adverse events to the FDA and that this failure to warn the FDA was both a cause in fact and the proximate cause of McKenzie's injury. So, Plaintiffs must show that had Defendant reported the adverse events to the FDA, Dr. Ventura or McKenzie would have acted differently.

Plaintiffs' failure to report adverse events theory is as follows. The FDA approved the Heartmate 3 on August 23, 2017, and Dr. Ventura implanted McKenzie's Heartmate 3 thirteen days later on September 5, 2017.[70] At unspecified times after Dr. Ventura

---

[68] While the LPLA contains a continuing duty to warn (La. R.S. § 9:2800.57(C)), Louisiana law applies the learned intermediary doctrine. *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 265 (5th Cir. 2002). "Under this doctrine, a drug manufacturer discharges its duty to consumers by reasonably informing prescribing physicians of the dangers of harm from a drug." *Id*. This reasoning applies equally to prescription medical devices, so Defendant's duty under the LPLA ran to Dr. Ventura. While timely reporting of adverse events to the FDA would have resulted in notice to Dr. Ventura of the adverse events via the FDA, it is not clear to the Court how the failure to effect that notification is a breach of the duty to warn Dr. Ventura. *Hughes v. Boston Scientific Corp*., 631 F.3d 762, 775 (5th Cir. 2011) held that the failure to report adverse events theory under Mississippi law was not expressly preempted, and *Gavin v. Medtronic, Inc*., 2013 WL 3791612, at *13 (E.D. La. July 19, 2013) held that the *Hughes* court's reasoning was applicable to Louisiana law, but the *Gavin* court did not devote substantial analysis to the viability of the theory under the LPLA itself. *Hughes* and *Gavin* focused on the express preemption analysis. Because the Court finds that Plaintiffs have failed to adequately plead the theory even if it is cognizable, the Court need not answer the question at this juncture.
[69] *Stahl v. Novartis Pharms. Corp*., 283 F.3d 254, 266–67 (5th Cir. 2002).
[70] Rec. Doc. No. 40, p. 2–4.

68447

implanted McKenzie's Heartmate 3, Defendant failed to report adverse events to the FDA.[71] Plaintiffs continue:

> If [D]efendant had timely and comprehensively reported adverse events to the FDA as required by federal law, the FDA would have disseminated the information to the public in its internet database (MAUDE) and in medical journals. Dr. Ventura would have reviewed this information and either (a) known to make sure to check the screw ring to ensure it was tight, (b) used a[n] outflow graft clip to prevent rotation, (c) chosen another heart device that did not have the outflow graft twisting problem, and/or (d) engaged in other corrective action.[72]

Further:

> Mr. McKenzie's injuries were proximately caused by [D]efendant's failure to [report adverse events to the FDA], which induced [Dr. Ventura] to implant the device without adequate training and/or information. Defendant's failure to report adverse events to the FDA and failure to train doctors on how to avoid occlusions, among other things, proximately caused her [sic] injuries.[73]

Plaintiffs' failure to report adverse events theory is not plausibly pled. While Plaintiffs allege failures to report adverse events, the *First Amended Complaint* lacks sufficient temporal allegations. Defendant points out that only thirteen days elapsed between FDA approval of the Heartmate 3 and the implantation of one into McKenzie. As such, argues Defendant, its disclosure of adverse events would not have caused McKenzie or Dr. Ventura to pursue any alternative options. Plaintiffs rebut that Defendant's argument goes to Plaintiffs' likelihood of success, so it is inappropriate at the motion to dismiss stage.

Under *Twombly/Iqbal*, this Court must determine whether, accepting all well-pleaded facts as true, Plaintiffs have plausibly—as opposed to possibly—alleged that

---

[71] *Id*. at 4–5.
[72] *Id*. at 6.
[73] *Id*.

Defendant violated the failure to warn provision of the LPLA.[74] This requires alleging a causal connection between the failure to warn and McKenzie's injury, which in turn requires a plausible inference that had Defendant timely reported adverse events, Dr. Ventura would have either implanted the Heartmate 3 differently or not implanted it at all. Plaintiffs have not done so because Plaintiffs have not alleged when Defendant failed to report adverse events with any particularity. There is no indication that Defendant failed to do so before a Heartmate 3 was implanted in McKenzie. Obviously, Dr. Ventura could not have acted on warnings he was not aware of. Therefore, while it is possible that there were unreported, relevant, adverse events in the thirteen-day period between FDA approval and implantation into McKenzie, Plaintiffs have not alleged sufficient facts from which the Court could infer that it is plausible that the reports of those events would have reached Dr. Ventura in time for him to act differently when implanting the Heartmate 3. It follows that Plaintiffs have not alleged an adequate causal link between Defendant's alleged failure to report and McKenzie's injuries.

Plaintiffs' suggestion in their *Opposition* that Dr. Ventura could have removed the Heartmate 3 after implantation had Defendant reported adverse events does not square with the allegations of the *First Amended Complaint*. In the *First Amended Complaint*, Plaintiffs allege the following alternative actions Dr. Ventura could have taken if he had been aware of the risks: ensuring the screw ring was tight, using an outflow graft clip, choosing another heart device, or "other corrective action."[75] Plaintiffs' cannot seek shelter under "other corrective action" by using the catch-all to cover all possibilities, including surgical explantation, without additional allegations that suggest that

---

[74] *Id.*
[75] *Id.*

explantation was even a possibility. Additionally, other parts of the *First Amended Complaint* belie the availability of this option. Plaintiffs allege that on April 5, 2018, Defendant "recalled" the Heartmate 3, however, McKenzie did not have his Heartmate 3 removed.[76] Based on the allegations in the *First Amended Complaint*, Plaintiffs' argument that Dr. Ventura could have removed McKenzie's Heartmate 3 had he known about the adverse events is implausible since McKenzie did not have his Heartmate 3 removed when faced with a recall of the same.

    4. <u>Express Warranty</u>

Plaintiffs assert a breach of express warranty claim under the LPLA. La. R.S. § 9:2800.58 provides:

> A product is unreasonably dangerous when it does not conform to an express warranty made at any time by the manufacturer about the product if the express warranty has induced the claimant or another person or entity to use the product and the claimant's damage was proximately caused because the express warranty was untrue.

The LPLA defines an express warranty as:

> [A] representation, statement of alleged fact or promise about a product or its nature, material or workmanship that represents, affirms or promises that the product or its nature, material or workmanship possesses specified characteristics or qualities or will meet a specified level of performance. "Express warranty" does not mean a general opinion about or general praise of a product.

Plaintiffs allege that Defendant breached express warranties made to Dr. Ventura and other physicians through promotional literature, sales representations, and on its website.[77] These "warranties" allegedly included the assertion on Defendant's website that the Heartmate 3 is "superior to all other [similar heart devices] in terms of survival,

---

[76] *Id.* at 2.
[77] *Id.* at 7.

68447

mortality, cardiac events[,] and quality of life."[78] Plaintiffs allege that Dr. Ventura relied on these warranties.[79]

The Fifth Circuit recently charted a course for courts analyzing an express warranty claim in the medical device preemption context. In *Wildman v. Medtronic, Inc.*, the court began with the basic principle that "[t]he essence of an express warranty claim is a broken promise."[80] "When the promise was one the FDA approved," the court continued, "tort liability for breaking it would conflict with the FDA's view that the representation was a sound one."[81] As such, "when a claim challenges a representation the FDA blessed in the approval process, it is preempted."[82] However, "when a claim challenges a warranty that goes above and beyond any guarantee the FDA expressly or implicitly approved, it is a parallel one," and, "[i]t is parallel because…federal law requires that representations about medical devices be truthful."[83]

Plaintiffs allege that the FDA does not regulate the "warranties" that Defendant made. Defendant argues that Plaintiffs did not adequately allege a parallel federal requirement and that the FDA's "Summary of Safety and Effectiveness Data" stated that the Heartmate 3 had certain advantages over other products.[84]

The Court finds that Plaintiffs' express warranty claim escapes express preemption as pled. Plaintiffs state in the *First Amended Complaint* that federal law allowed Defendant to monitor its own advertisements but required that they be truthful.[85] Plaintiffs

---

[78] *Id*.
[79] *Id*. at 8.
[80] *Wildman v. Medtronic, Inc.*, 874 F.3d 862, 867 (5th Cir. 2017).
[81] *Id*. at 868.
[82] *Id*.
[83] *Id*.
[84] Rec. Doc. No. 43-1, p. 30.
[85] Rec. Doc. No. 40, p. 7.

68447

assert that the advertisements were false, which means that the claim parallels federal requirements. The Court will not consider the FDA's "Summary of Safety and Effectiveness Data" as it is not within the four corners of the *First Amended Complaint*.

Plaintiffs' breach of express warranty claim does not survive Fed. R. Civ. P. 12(b)(6). Plaintiffs allege that the warranty was that "Heartmate 3 was superior to all other [heart devices] in terms of survival, mortality, cardiac events[,] and quality of life."[86] This statement is vague, and does not contain enough information for the Court to assess whether the Defendant's representation was a warranty or "mere puffery," but there is a more fundamental issue. The "warranty" that Plaintiffs assert existed is a comparison to other heart devices, but Plaintiffs do not allege anything about the relevant characteristics of other heart devices. In other words, Plaintiffs allege nothing to disprove the validity of the "warranty" that the Heartmate 3 was superior to other devices, besides the assertion that the "warranty" was "untrue," which is conclusory and therefore irrelevant. This is insufficient to state a claim under La. R.S. § 9:2800.58 and Fed. R. Civ. P. 12(b)(6) because Plaintiffs do not allege that the Heartmate 3 failed to conform to the "warranty." Plaintiffs' breach of express warranty claim is therefore dismissed.

In sum, Plaintiffs' failure to train claim is not cognizable under the LPLA and is dismissed. Plaintiffs' failure to warn and breach of express warranty claims are either expressly preempted or fail under Fed. R. Civ. P. 12(b)(6) and are dismissed. Plaintiffs' mismanufacture claim survives Fed. R. Civ. P. 12(b)(6) and express preemption and is not dismissed.

---

[86] *Id.*

68447

## C. Implied Preemption under the Medical Device Amendments

Defendant alternatively argues that Plaintiffs' claims are impliedly preempted.[87] Congress, upon enacting the Medical Device Amendments, intended that they be "enforced exclusively by the Federal Government."[88] Therefore, §337(a) preempts any private action seeking to enforce the duties of the FDA regarding its relationship with entities it regulates.[89] The Defendant contends that the Plaintiffs' allegation in the *First Amended Complaint* is an effort to enforce the FDCA, which is preempted by §337(a) as interpreted by *Buckman*.

In *Buckman*, the Supreme Court held that a "fraud-on-the-FDA" claim is preempted because it would interfere with the FDA's ability to enforce the law. However, in *Bass* the Fifth Circuit rejected an interpretation of *Buckman* providing for absolute preemption.[90] Rather, the Fifth Circuit noted "that there is a difference between the 'freestanding federal cause of action . . . and a state-law tort claim.'"[91] The Fifth Circuit further clarified that a "case [that] is premised on state-law tort claims rather than any duties independently created by FDA regulations…" is not impliedly preempted.

The Court finds that Plaintiffs' mismanufacture claim is not impliedly preempted. The mismanufacture claim is based in state law (the LPLA); it is not a "freestanding federal causes of action." The Court need not reach a conclusion as to Plaintiffs' failure to train, failure to warn, and breach of express warranty claims because they are either expressly preempted or fail under Fed. R. Civ. P. 12(b)(6).

---

[87] Rec. Doc. No. 17-1, p. 8.
[88] *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 352 (2001) (citing 21 U.S.C. § 337(a)).
[89] *Id.* at 348.
[90] *Bass v. Stryker Corp.*, 669 F.3d 501, 514 (5th Cir. 2012).
[91] *Id.* (citing *Hughes v. Boston Scientific Corp.*, 631 F.3d 782, 775 (5th Cir. 2011)).

68447

### III. CONCLUSION

Defendant's *Motion to Dismiss*[92] is granted in part and denied in part. Defendant's *Request for Judicial Notice*[93] is denied. Plaintiffs' *Alternative Request for Judicial Notice*[94] is denied as moot. Plaintiffs' *Alternative Motion to Continue Consideration of Defendant's Rule 12(b)(6) Motion Pending Limited Preemption Discovery by the Plaintiffs*[95] is denied as moot.

Plaintiffs will have 21 days from the date of this *Ruling* to cure the deficiencies in the *First Amended Complaint*. If Plaintiffs do not cure the deficiencies, Plaintiffs' claims for breach of express warranty, failure to train, and failure to warn will be dismissed with prejudice.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on September 24, 2021.

_____
**CHIEF JUDGE SHELLY D. DICK
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**

---

[92] Rec. Doc. No. 43.
[93] Rec. Doc. No. 44.
[94] Rec. Doc. No. 56.
[95] Rec. Doc. No. 57.

68447